**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-2034**

STANLEY JEFFREY PENLEY,

Plaintiff - Appellant,

v.

MCDOWELL COUNTY BOARD OF EDUCATION; GERRI MARTÍN, in her official and individual capacities; NATALIE GOUGE, in her official and individual capacities; ROBERT GILLESPIE, a/k/a Mitch Gillespie; H. RUSSELL NEIGHBORS, in his official and individual capacities,

Defendants - Appellees.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Max O. Cogburn, Jr., District Judge. (1:14-cv-00170-MOC-DLH)

Argued: September 15, 2017                    Decided: November 28, 2017

Before WILKINSON, DUNCAN, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Duncan joined. Judge Wilkinson wrote a concurring opinion.

**ARGUED:** David Philip Kula, LAW OFFICE OF DAVID KULA, Asheville, North Carolina, for Appellant. Robert J. King III, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina, for Appellees. **ON BRIEF:** Julia C. Ambrose, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina, for Appellees McDowell County Board

of Education, Natalie Gouge, and H. Russell Neighbors.   Ann-Patton Hornthal, ROBERTS & STEVENS, P.A., Asheville, North Carolina, for Appellee Gerri Martin. Ronald K. Payne, LONG, PARKER, WARREN, ANDERSON & PAYNE, P.A., Asheville, North Carolina, for Appellee Robert "Mitch" Gillespie.

THACKER, Circuit Judge:

Stanley Jeffrey Penley ("Appellant") was a teacher at McDowell County High School ("MHS") from 2006 to 2013. He also regularly worked as a media strategist on political campaigns. Following an incident in Appellant's classroom in April 2013 in which he made an inappropriate comment to his students, Appellant was suspended, investigated, and recommended for dismissal. Appellant initiated this action against the school principal, the superintendent, the board of education, a board member, and a member of the North Carolina House of Representatives alleging the suspension, investigation, and recommendation of dismissal were in retaliation for his political speech.

The district court granted summary judgment to Appellees and dismissed the case. Because Appellant has not put forward evidence beyond mere speculation in support of his claims, he cannot make a prima facie showing of retaliation. Accordingly, we affirm the decision of the district court.

I.

A.

We view the relevant facts "in the light most favorable to the nonmoving party," Appellant. *Grutzmacher v. Howard Cty.*, 851 F.3d 332, 342 (4th Cir. 2017). From 2006 to April 2013, Appellant taught high school civics at MHS. During this time, Appellant was generally well respected among the students and had a near-spotless personnel record at MHS.

3

In 2004, 2006, and 2008, Appellant also worked on campaigns of politicians running against North Carolina House of Representatives Member Robert Gillespie ("Gillespie"). As early as 2006 and continuing through 2012, Gillespie vocalized his disdain for Appellant to MHS's former principal, Ben Talbert ("Talbert"), and former superintendent, Mike Murray ("Murray"). After these conversations, Talbert and Murray warned Appellant that Gillespie wanted him terminated. Additionally, as a result of Appellant's campaign work, Gillespie allegedly threatened Appellant directly saying he would pay Appellant back and "beat [him] like a bad drum." J.A. 785:13–14.[1]

At the beginning of the 2012–2013 school year, Gillespie toured MHS with the newly hired superintendent, Gerri Martín ("Martín"). During the tour, Gillespie refused to enter Appellant's classroom, explaining to Martín that Appellant had "worked against [Gillespie] in previous elections." J.A. 663:3–664:9. When Gillespie and Martín approached Appellant's classroom doorway, Gillespie allegedly pulled Martín back and said "that's the one I've been telling you about." *Id.* at 475:1–7. On the same day, Gillespie also approached Talbert to remind him of Gillespie's contempt for Appellant.

### B.

Fast forward to April 17, 2013. On that day, during AP Government class, Appellant told his students, "There is a study out there that says that men think about sex every six seconds, unless you happen to be sitting next to your girlfriend, and it might be

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

more like four seconds." J.A. 381:9–19. Two students, a boyfriend and girlfriend, were seated next to each other when Appellant made this comment. The girlfriend became upset, believing it to be directed at her. During the mid-class lunch break that day, Appellant apologized to the girlfriend. Later in the day, Appellant witnessed the girlfriend crying in the library during his planning period. He went back and forth to the library to "find out what was going on." *Id.* at 393:15. Then, when the girlfriend exited the library, Appellant sought her out and confronted her in a stairwell. Appellant's stated goal for stopping the girlfriend in the stairwell was to prevent her from going to the principal. *See id.* at 387:18–21 ("Q. Well, would your goal, when you spoke to [girlfriend] at 3-something in the afternoon, to, the end result be, that she would not go to the principal? A. Yes."). The girlfriend, through her mother, ultimately reported Appellant to school administrators.

C.

After the girlfriend's mother complained about Appellant, the newly hired principal, Natalie Gouge ("Gouge"), contacted the assistant superintendent, Mark Garrett ("Garrett"), who instructed Gouge to begin an investigation. On April 18, 2013, Gouge met with the girlfriend to discuss the comment. The girlfriend gave Gouge handwritten notes of her recollection of the incident. The notes reflect that Appellant targeted her and her boyfriend by saying "What are you guys laughing about? Oh [boyfriend], I bet you know all about that don't you? Only it's every four seconds since your girlfriend is sitting right next to you. I bet it's six seconds any other time. Right, [girlfriend]?" J.A. 1169. The same day, Gouge interviewed Appellant and other students. During

Appellant's interview, he admitted that the in-class comment was not part of his curriculum. During the student interviews, Gouge also learned of an inappropriate Facebook exchange between Appellant and a student. The exchange was a series of comments on a shirtless photo of the student. The exchange is as follows:

> Appellant: [Student], I'm going to have to de-friend you if you don't put some clothes on. Are you trying to join NAMBLA![2]
>
> Student: Mr. Penly [sic], why are you checking me out with no clothes on.
>
> Appellant: Hey, you sent that pic to me. You know i'm [sic] happily married. And you obviously have [started] playing for the other TEAM!
>
> Student: Hahahahaha I meant to send it to Julia sorry.

*Id.* at 536.

After these interviews, Gouge drafted a letter of reprimand dated April 22, 2013. Before delivering the letter to Appellant, Gouge consulted with Martín. Martín declined to issue a letter of reprimand and instead opted to suspend Appellant with pay pending further action. Martín instructed that a more in-depth investigation take place.

As part of this further in-depth investigation, on April 24, 2013, Gouge interviewed all of the students present in Appellant's class when the offending comment was made. In the interviews, some of the students' accounts supported the claim that Appellant directed his statement at the girlfriend and boyfriend. Other students could not

---

[2] NAMBLA is an acronym for the North American Man-Boy Love Association, an advocacy group for pedophilia and pederasty.

6

remember what was said or what happened. Significantly, none of the students said that the comment was not directed at the girlfriend and boyfriend. Furthermore, on May 6, 2013, Appellant participated in a recorded interview with Martín and two other administrators related to the comment, the Facebook exchange, and other inappropriate behavior uncovered by the investigation.[3] Appellant admitted during this interview: "I wish I could take back everything" and "[w]hen I realized I had hurt [the girlfriend], I felt awful. I feel terrible." J.A. 616, 617.

## D.

On August 21, 2013, Martín issued a notice of intent to recommend dismissal ("Notice") to Appellant. The Notice contained six alleged violations: (i) immorality; (ii) insubordination; (iii) neglect of duty; (iv) failure to fulfill the duties and responsibilities imposed upon teachers by the general statutes of North Carolina; (v) failure to comply with such reasonable requirements as the board may prescribe; and (vi) any cause which constitutes grounds for the revocation of the career teacher's teaching license. Then, in September 2013, Martín left her position as superintendent, and Garrett became the interim superintendent.

---

[3] Appellant was also interviewed about reported in-class discussions of gays and lesbians having sex in the school bathrooms and Appellant's Facebook activity, including his Facebook friendship with students, the inappropriate Facebook exchange between him and a student, and his online Facebook activity during school hours. Further, Appellant was questioned about the relevance to his curriculum of a story he told in class about Lorena Bobbitt. Lastly, Appellant was confronted about his in-class use of YouTube.

Appellant requested that the grounds for Martín's Notice be reviewed by a hearing officer at an administrative hearing. In late October 2013, an administrative hearing was conducted regarding the Notice. Appellant was able to present evidence and cross examine witnesses. Ultimately, the hearing officer found that the evidence against Appellant did not warrant Appellant's termination. Garrett then reinstated Appellant to a position at a different institution, Early College, in McDowell County.

Also in the fall of 2013, Appellant attended a teachers' rally at the McDowell County courthouse. Two incumbent McDowell County Board of Education members and one former Board member also attended the rally. Appellant alleges that the Board members told him that another Board member, Russell H. Neighbors ("Neighbors"), and Martín were conniving to have Appellant terminated and that the charges against him "were garbage concocted by . . . Martin [sic]." J.A. 508:10–11.

E.

Appellant filed his initial complaint in the Western District of North Carolina on July 7, 2014, against the Board, Gillespie, Martín, Gouge, and Neighbors (collectively, "Appellees"). He filed an amended complaint on September 12, 2014, alleging the following six claims:

> (1) Count I – First Amendment Retaliation pursuant to 42 U.S.C § 1983 against Neighbors, Martín, and Gouge in their individual capacities and Gillespie and the Board;
>
> (2) Count II – Civil Conspiracy against Martín, Neighbors, Gouge, and Gillespie in their individual capacities;
>
> (3) Count III – North Carolina constitutional violations (in the alternative) against Neighbors, Martín, and Gouge

8

in their individual capacities and Gillespie and the Board;

    (4)    Count IV – Intentional Infliction of Emotional Distress against Martín, Gouge and Gillespie; [4]

    (5)    Count V – Tortious Interference with Contract against Gillespie; and

    (6)    Count VI – Malicious Prosecution against Martín in her individual capacity.

On April 22, 2016, all Appellees filed motions for summary judgment. After briefing and oral argument, the district court granted the motions and dismissed the amended complaint in its entirety. Appellant timely appealed.

## II.

"We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Grutzmacher v. Howard Cty.*, 851 F.3d 332, 342 (4th Cir. 2017) (quoting *Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[4] Count IV was voluntarily dismissed on September 18, 2015.

III.

A.

First Amendment Retaliation

As explained below, all Appellees are entitled to summary judgment on Appellant's First Amendment retaliation claim. The Board is not subject to municipal liability, and Appellant is unable to present a prima facie case against the remaining Appellees. For these reasons, we affirm the district court on Appellant's First Amendment retaliation claim.

1.

The Board and Municipal Liability

"To hold a municipality (a local government entity) liable for a constitutional violation under § 1983, the plaintiff must show that the execution of a policy or custom of the municipality caused the violation." *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (citing *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 195 (4th Cir. 1994)). "[M]unicipal liability may be imposed for a single decision by municipal policy-makers under appropriate circumstances." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986). However, "[t]o hold a municipality liable for a single decision (or violation), the decisionmaker must possess 'final authority to establish municipal policy with respect to the action ordered.'" *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur*, 475 U.S. at 481). And, a county board of education may only be held liable for "officially sanctioned or ordered" acts. *Pembaur*, 475 U.S. at 480.

Appellant asserts that Martín had "full . . . *and final* authority" to issue the Notice and suspend Appellant with and without pay and thus was the final policymaker for these discrete actions. Appellant's Reply Br. 25 (emphasis in original); *see also* Appellant's Br. 53–54. Moreover, Appellant admits that the Board "has no authority to act" regarding the Notice and suspensions. Appellant's Reply Br. 24. Nonetheless, Appellant believes that the Board's lack of oversight with regard to these actions consequently makes Martín the final policymaker, and as such, her actions imputable to the Board. This argument is meritless. A county board of education "cannot be held liable for personnel decisions over which it did not retain final review authority; that is, it is not liable for decisions committed to [the superintendent's] discretion because there is no respondeat superior liability under § 1983." *Love-Lane*, 355 F.3d at 782.

In order to prevail, Appellant must show that the Board "was aware of the [alleged] constitutional violation and either participated in, or otherwise condoned it." *Love-Lane*, 355 F.3d at 783. Here, there is no evidence that the Board participated in or condoned Appellant's suspensions or investigation, or that it was aware of a potential constitutional violation. Indeed, Appellant admitted that the "[s]uperintendent alone . . . can decide to initiate charges and issue a Notice." Appellant's Reply Br. 25. Moreover, although at the administrative hearing Appellant argued that his recommended dismissal was retaliatory in nature for his involvement in political campaigns, the Board was never involved in the hearing procedure and therefore was not on notice of Appellant's alleged constitutional violations. This is underscored by the fact that Garrett did not directly ask the Board to terminate Appellant. Instead, Garrett, on his own accord, reinstated

11

Appellant. For these reasons, the Board is not subject to municipal liability in this case and the district court's decision is affirmed as to the Board.

2.

Remaining Appellees

a.

Where a public employee sues a government employer for First Amendment retaliation pursuant to § 1983, the employee must prove:

> (1) [He] was speaking as a citizen upon a matter of public concern [and not] as an employee about a matter of personal interest; (2) [His] interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) [His] speech was a substantial factor in the employee's [adverse employment] decision.

*McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998) (the "*McVey* test"); *accord Grutzmacher v. Howard Cty.*, 851 F.3d 332, 342 (4th Cir. 2017). Here, the parties only dispute prong three of this test -- also called the causation prong.

This court recently reiterated a two-step process for analyzing the requisite "but for" causation necessary to satisfy the causation prong of the *McVey* test.

> The plaintiff bears the initial burden of proving that his exercise of his First Amendment rights was a substantial or motivating factor in the employer's [adverse employment] decision . . . . And if the plaintiff satisfies that burden, the defendant will avoid liability if he can demonstrate, by a preponderance of the evidence, that he would have made the same employment decision absent the protected expression.

*Bland v. Roberts*, 730 F.3d 368, 375 (4th Cir. 2013) (internal citations and quotations omitted); *see also Ridpath v. Bd. of Gov'rs Marshall Univ.*, 447 F.3d 292, 318 (4th Cir.

12

2006) ("The causation requirement is 'rigorous' in that the protected expression must have been the 'but for' cause of the adverse employment action alleged."). This two-step process is consistent with Supreme Court precedent. *See Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977) (holding if a plaintiff can show a prima facie case of First Amendment retaliation, the district court should go on to determine whether the defendant has shown "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct").

b.

This court has repeatedly stated that where causal facts are in dispute, giving rise to a genuine issue of material fact, summary judgment is not appropriate. *See, e.g.*, *Love-Lane*, 355 F.3d at 779 ("If the causal facts about the [adverse employment action] are in dispute, summary judgment is not appropriate."); *id.* at 776 ("Causation can be decided on summary judgment only in those instances when there are no causal facts in dispute." (internal quotations omitted)). If there is no genuine issue of material fact on causation and the plaintiff can prove a prima facie case, the burden shifts to the employer to prove "by a preponderance of the evidence, that he would have made the same employment decision absent the protected expression." *Bland*, 730 F.3d at 375. To make a prima facie showing of causation, Appellant must put forward evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation. *See id.* at 383–84.

i.

Appellees Neighbors and Gillespie

Appellant has not offered even a mere scintilla of evidence that Neighbors or Gillespie caused his alleged adverse employment action. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) ("A plaintiff seeking to recover for First Amendment retaliation must allege that . . . *the defendants took some action* that adversely affected her First Amendment rights . . . ." (emphasis supplied)); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000) ("[T]he employee must establish retaliation of some kind -- that he was deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill his exercise of First Amendment rights."). Indeed, neither Gillespie nor Neighbors took *any* action with regard to Appellant's employment, much less any adverse employment action. Without such evidence, Appellant cannot make out a prima facie case of First Amendment retaliation against Neighbors or Gillespie. Accordingly, summary judgment was appropriate as to Neighbors and Gillespie.

ii.

Appellee Gouge

As to Gouge, although she conducted and participated in the investigation, Appellant lacks sufficient evidence to prove the requisite causal connection. Indeed, Appellant admitted as much during his deposition:

> Q: Okay. Do you have any actual evidence that Ms. Gouge's actions were motivated by a desire to punish you for your political activities?

14

A:  I do not.

J.A. 504:25–505:3.

Student declarations claiming both that Gouge pressured them to make certain statements during interviews and that her notes from these interviews are inaccurate are Appellant's only circumstantial evidence of causation.  But these statements only speak to the propriety of the investigation.  They do not create a causal link between Gouge's investigation and Appellant's political speech.  Moreover, Gouge's extended investigation was conducted at the behest of Martín, Gouge's superior, who simply directed Gouge to investigate further due to the seriousness of the allegations.  This was a quite reasonable directive under the circumstances.  Therefore, no reasonable jury could conclude that Appellant's speech was a substantial factor in Gouge's investigation.

iii.

Appellee Martín

Appellant also cannot satisfy the causation prong of the prima facie case against Martín.  In retaliation cases, a causal connection may exist where the employer takes adverse employment action against an employee shortly after learning of the protected activity.  *See Tobey v. Jones*, 706 F.3d 379, 387–88 (4th Cir. 2013) (examining causal connection for First Amendment retaliation claim); *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (examining causal relationship in Title VII context); *see also Saleh v. Upadhyay*, 11 F. App'x 241, 256–57 (4th Cir. 2001) (per curiam).  It follows that "generally the passage of time . . . tends to negate the inference of [causation]."  *Price*, 380 F.3d at 213; *see Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d

15

653, 657 (4th Cir. 1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."). Where a plaintiff rests his case on temporal proximity alone, the temporal proximity must be very close. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept *mere* temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." (internal quotations omitted) (emphasis supplied)).

With regard to Martín, Appellant primarily rests his argument on temporal proximity, but Appellant and Martín dispute when Martín knew of Appellant's work in opposition to Gillespie. Martín claims in her declaration that she was unaware of Appellant's political speech as of April 21, 2013, but Appellant claims Martín knew of the protected speech during the tour of MHS due to Gillespie's comments. *See* J.A. 663:22–664:9 (informing Martín Appellant had "worked against [Gillespie] in previous elections"), 475:1–7 (telling Martín, "that's the one I've been telling you about"). On summary judgment review, we accept the contention of the nonmoving party, Appellant, that Martín knew of the protected speech eight to nine months prior to initiating the investigation. Regardless, this fact is "simply not a sufficient basis for a reasonable inference [of causation]." *Bland*, 730 F.3d at 384. Standing alone, knowledge eight to nine months prior is not "very close." *Breeden*, 532 U.S. at 273; *see Booth v. Maryland*,

16

337 F. App'x 301, 310 (4th Cir. 2009) (per curiam) (concluding that a nine month lapse was too remote to prove a causal connection alone).

Further, Appellant's additional circumstantial evidence of causation does little, if anything, to help his case. In this vein, Appellant proffers the following: (1) Martín's admission that she did not review Appellant's personnel file and did not consult with other administrators about disciplinary action; (2) evidence suggesting allegations supporting Appellant's suspension were not based on legitimate policies and, to the extent that these policies were applied, they were applied inconsistently; (3) student declarations stating that during the investigation, students were pressured to lie about Appellant's actions and that notes of student interviews contain inaccurate information; and (4) the hearing officer's report rejecting the grounds for Appellant's dismissal.[5] This circumstantial evidence does nothing more to demonstrate that Appellant's protected speech was a substantial motivating factor in the adverse employment action. The only piece of evidence connecting the speech to the investigation is that Martín learned of the protected speech eight to nine months earlier. In this case, eight to nine months is too distant to raise an inference of causation.

---

[5] Appellees assert that under Federal Rule of Civil Procedure 56, the court should not consider the hearing officer's report because it is inadmissible hearsay, is unreliable, and because none of the Appellees were party to the administrative hearing. *See* Appellees' Br. 36. But, the hearing report is not hearsay because it is not offered simply to prove the truth of the matter asserted. Instead, it is offered to show that the charges were rejected by the hearing officer.

Appellant relies on *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), to support the position that the eight to nine month time frame is sufficient to create an inference of causation. However, *Price* is not persuasive in this context. In *Price*, we assumed without deciding that "in the failure-to-hire context, the employer's knowledge coupled with an adverse action taken at the first opportunity [nine to ten months later] satisfies the causal connection element of the prima facie case." *Id.* We noted in *Price* that causation was a "close question" but found that a reasonable trier of fact could conclude that the defendant knew of the protected activity and because of the protected activity, the defendant, at the first available opportunity, declined to hire the plaintiff. *Id.* The "first available opportunity" notion discussed in *Price* is specific to the failure-to-hire context and, therefore, is inapplicable here. Thus, *Price* does not save Appellant.

3.

### *Mt. Healthy* Defense

In *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977), the Supreme Court held that if a plaintiff can prove a prima facie case of First Amendment retaliation, a defendant will avoid liability if it demonstrates "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Id.* (the "*Mt. Healthy* defense"); *accord Bland*, 730 F.3d at 375. Here, even assuming Appellant could prove a prima facie case of retaliation, Appellees have demonstrated by a preponderance of the evidence that the investigation, suspensions, and Notice would have been issued even in the absence of the protected

18

conduct. Indeed, the initiation of the investigation in this case was taken in response to the comment Appellant himself admits was inappropriate.

The investigation was initiated by Gouge, approved by Garrett, and extended by Martín. The suspensions and Notice were both imposed by Martín. Appellees submitted declarations of two veteran superintendents who concurred in the reasonableness of the procedures. The Notice lays out ample grounds for its issuance, even if they were ultimately found not to warrant termination. And significantly, Appellant himself admits that he "would hope" that if a student "went to the administration [with her complaint], the administration would take some sort of action, at least an investigation," and that if a teacher denies the allegation, the administration "should investigate" it "thoroughly." J.A. 395:21–396:8.

Ultimately, Appellant asks this court to invade the realm of local administration of school systems reserved to the states by the Tenth Amendment. We decline to do so. It is difficult to fathom how a school and its administrators could be liable for investigating and taking disciplinary action for the legitimately inappropriate behavior to which Appellant has admitted in this case. *See* J.A. 613 ("I crossed the line. I'm so sorry."), 618 ("I messed up. I said something I shouldn't have said. . . . I had no idea I was being inappropriate."), 374:6–11 (admitting it would be inappropriate to say a student was a pedophile), 390:15–25 (admitting that if Appellant said what the girlfriend reported, it would be inappropriate and the girlfriend would have a legitimate reason to complain).

19

B.

Civil Conspiracy

"To establish a conspiracy claim under § 1983, a plaintiff 'must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right.'" *Massey v. Ojaniit*, 759 F.3d 343, 357–58 (4th Cir. 2014) (alterations in original) (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)). This burden is "weighty." *Hinkle*, 81 F.3d at 421. "While they need not produce direct evidence of a meeting of the minds, [plaintiffs] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id.* The evidence "must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.*

Here, the district court determined that Appellant's conspiracy claim failed because there had been no constitutional deprivation due to the failure of Appellant's First Amendment claim. In the alternative, the district court decided that the conspiracy claim failed because Appellant "failed to come forward with any evidence, either circumstantial or direct, that would allow a jury to find the existence of a conspiracy." J.A. 1250. Because Appellant's "evidence amounts to nothing more than rank speculation and conjecture[,]" we agree with the district court. *Hinkle*, 81 F.3d at 422.

This court has "recognize[d] that direct evidence of a conspiracy is not always available" but the court "cannot use this fact as an excuse to forgive Appellant['s] failure

20

to prove [his] case." *Hinkle*, 81 F.3d at 423. Appellant's allegation of a conspiracy against Appellees here is not supported by any evidence rising above mere speculation and shows only that Appellees knew each other. Acquaintanceships alone are insufficient to prove a conspiracy. "There is a reason why we do not allow this level of conjecture to determine lawsuits: such adventures of the mind tend to be unreliable." *Id.*

1.

Appellee Neighbors

In his deposition, Appellant quite clearly admitted that he has no direct evidence that Neighbors conspired with any other Appellee:

> Q. Do you have any evidence that Russell Neighbors in any way influenced Dr. Martin in the disciplinary proceedings against you?
>
> A. No.
>
> . . .
>
> Q. Well, do you have any evidence . . . that Mitch Gillespie and Russell Neighbors ever had a discussion or communication about you before this lawsuit was filed?
>
> A. I do not have actual evidence, no.
>
> Q. Do you have any evidence that Russell Neighbors had a communication with anybody about you before you were suspended from your job?
>
> A. I do not.
>
> Q. Do you have any evidence that Russell Neighbors communicated with anybody concerning you prior to the decision by the superintendent to recommend termination?

A. I do not.

J.A. 330:19–22, 506:25–507:13. Appellant further admitted he did not have any evidence that "Russell Neighbors was telling . . . Martín what to do with respect to [Appellant's] employment at any time prior to the end of April 2013." *Id.* at 530:17–21.

Despite these admissions, Appellant attempts to rest his case against Neighbors on three pieces of circumstantial evidence: (1) deposition testimony demonstrating that Neighbors was a mutual friend of Gillespie and Martín; (2) text messages showing Neighbors was helping Martín find other employment; and (3) Appellant's account of statements made to him by other board members implicating Neighbors in a scheme to have him fired.

Friendship or acquaintanceship, standing alone, is insufficient to "reasonably lead to the inference that Appellees positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Hinkle*, 81 F.3d at 421; *cf. United States v. Burgos*, 94 F.3d 849, 869–70 (4th Cir. 1996) (concluding that for a criminal conspiracy, acquaintanceship constitutes circumstantial evidence that may, along with other evidence, support a conviction). At base, Appellant's evidence requires "speculation and the piling of inferences" and is inadequate to show any "mutual understanding" reached by Neighbors and any other Appellee. *Hinkle*, 81 F.3d at 421, 423. Therefore, Appellant's civil conspiracy claim against Neighbors fails.

22

2.

Appellee Gouge

Likewise, Appellant has offered no direct evidence that Gouge conspired with any other Appellees. During deposition, Appellant admitted the following:

> Q. Well, can you point me to any evidence where it says that Ms. Gouge did these things in order to curry favor with Dr. Martin [sic]?
>
> A. No.
>
> . . .
>
> Q. Do you have any evidence that Ms. Gouge was trying to curry favor with Mr. Neighbors as part of the disciplinary process?
>
> A. No.
>
> Q. Okay. Do you have any evidence that Ms. Gouge was trying to curry favor with Mr. Gillespie as part of the disciplinary process?
>
> A. No.
>
> . . .
>
> Q: Okay. Sitting here today, do you have any actual evidence that Natalie Gouge entered into a conspiracy or an agreement with anybody to pursue a disciplinary proceeding in order to punish you for your political activities?
>
> A: I -- I have no actual evidence. I have circumstantial evidence in that she built a case of lies and made things up about me, and I believe that she did that to win favor with the new superintendent as well as others.

J.A. 470:17–20, 491:2–9, 504:15–25.

23

Appellant rests his conspiracy case against Gouge on the same circumstantial evidence offered in support of his First Amendment retaliation claim -- that she pressured students in interviews and took inaccurate notes. If anything, this evidence evinces nothing more than misconduct on Gouge's part. The link to any animus is pure speculation. No reasonable trier of fact could conclude, based on this evidence, that Gouge reached any mutual understanding with any of the other Appellees in this case.

3.

Appellees Gillespie and Martín

As for Gillespie and Martín, Appellant again puts forth no direct evidence of a conspiracy. Appellant admitted:

> Q. Do you have any actual evidence that Mitch Gillespie actually did anything to either cause or encourage Dr. Martin's [sic] suspension or recommendation of termination?
>
> A. No.
>
> . . .
>
> Q. Well, do you have any evidence that Dr. Martin [sic] was taking action as to you as part of this conspiracy with Mr. Gillespie and Mr. Neighbors? Do you have any actual evidence?
>
> A. No. No.

*Id.* at 319:23–320:2, 328:20–24. Although Appellant has presented circumstantial evidence that Gillespie communicated his disdain for Appellant to Martín, there is no evidence beyond conjecture that the two ever had a mutual understanding to retaliate against Appellant for his protected speech. There is no specific circumstantial evidence

24

connecting Gillespie's animus to Martín's action weighty enough to create a genuine issue of material fact as to these two defendants.

4.

Conspiracy Evidence

Appellant has not met his burden to come forward with "specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Hinkle*, 81 F.3d at 421. Therefore, the district court did not err in granting summary judgment on the Appellant's civil conspiracy claim.

C.

North Carolina Constitution

In his Amended Complaint, Appellant asserts an alternative claim for retaliation based on the exercise of his rights under Sections 12 and 14 of Article I of the North Carolina constitution. Appellant brought this claim against Gouge, Martín, and Neighbors in their official capacities, and the Board and Gillespie. The district court disposed of these claims for the same reasons it disposed of Appellant's First Amendment retaliation claim. We do the same.

In North Carolina, "[t]he standards for free speech retaliation claims under the state constitution are the same as those for free speech claims under the federal constitution." *Sheaffer v. Cty. of Chatham*, 337 F. Supp. 2d 709, 729 (M.D.N.C. 2004); *see Evans v. Cowan*, 510 S.E.2d 170, 175–76 (N.C. Ct. App. 1999). As discussed, Appellant's First Amendment retaliation claim fails on the merits as to Gouge, Gillespie,

Martín, and Neighbors. Accordingly, his North Carolina constitutional claim similarly fails as to these Appellees.

In North Carolina, a plaintiff can only proceed under the state constitution against the state if no other adequate state law remedy exists. *See Corum v. Univ. of N.C. Through Bd. of Gov'rs*, 413 S.E.2d 276, 289 (N.C. 1992) ("[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution."). Here, Appellant has not alleged any other state law claims against the Board so he has not otherwise attempted to gain an adequate remedy under state law. Moreover, Appellant has not shown (or even argued) that he does not have any other adequate state remedy. *See Craig ex rel. Craig v. New Hanover Cty. Bd. of Ed.*, 678 S.E.2d 351, 355 (N.C. 2009) ("[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim."). Because a claim against North Carolina under the North Carolina constitution is only available in the absence of an adequate state remedy, Appellant does not have a claim against the Board. Accordingly, the district court is affirmed as to Appellant's North Carolina constitutional claim.

D.

Tortious Interference

Appellant argues that the district court erred by granting summary judgment on Appellant's tortious interference claim because, according to Appellant, Gillespie did not challenge this claim in his motion for summary judgment. But his motion clearly requested summary judgment on "all claims against him." J.A. 271. While courts are not

26

obligated to do the work of the litigants, even if Gillespie presented no argument or authority on the tortious interference claim, district courts may enter summary judgment sua sponte "so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Here, Gillespie moved for summary judgment on "all claims against him." J.A. 271. Appellant had raised five claims against Gillespie, including the tortious interference claim. Accordingly, Appellant was on notice "to come forward with all . . . evidence" relevant to his tortious interference claim, satisfying *Celotex*. *See Celotex*, 477 U.S. at 326; *see also Allstate Ins. Co. v. Fritz*, 452 F.3d 316, 323 (4th Cir. 2006) (finding adequate notice where one of two defendants moved for summary judgment on negligence claim).

We agree with the district court that Appellant has failed to put forward adequate evidence to demonstrate that Gillespie intentionally induced any other Appellee to breach Appellant's employment contract with the Board. Accordingly, the district court did not err.

### E.

### Malicious Prosecution

Finally, Appellant alleges a state law claim for malicious prosecution against Martín for the initiation of dismissal proceedings and prosecution of the charges contained in the Notice. The district court determined that "[b]ecause Plaintiff . . . failed to establish a genuine issue of material fact as to malice and lack of probable cause, summary judgment [was] appropriate on Plaintiff's claim for malicious prosecution."

27

J.A. 1258. We agree that Appellant has not presented sufficient evidence to show a lack of probable cause.

Under North Carolina law, in order to establish a claim for malicious prosecution, "a plaintiff must show that the defendant (1) initiated or participated in the earlier proceeding; (2) did so maliciously; (3) without probable cause; and (4) the earlier proceeding ended in favor of the plaintiff." *Turner v. Thomas*, 794 S.E.2d 439, 444 (N.C. 2016). The parties here do not dispute the first or fourth elements. "Where the claim is one for malicious prosecution, [p]robable cause . . . has been properly defined as the existence of such facts and circumstances, known to [the defendant] at the time, as would induce a reasonable man to commence a prosecution." *Best v. Duke Univ.*, 448 S.E.2d 506, 510 (N.C. 1994) (alterations in original) (internal quotations omitted).

In fact, the grounds set forth in the Notice outline the facts and circumstances known to Martín at the commencement of the prosecution. This is undisputed. But, Appellant has not produced evidence sufficient to support a finding that, in light of these facts and circumstances known to Martín, it was unreasonable to commence a prosecution. To show unreasonableness, Appellant relies on Gouge's preliminary determination that a letter of reprimand was the appropriate disciplinary action for Appellant's inappropriate comment. Appellant compares Martín's Notice to Gouge's letter of reprimand. The difference in severity of discipline, Appellant argues, demonstrates that the facts would not induce a reasonable person to commence a prosecution. However, the letter of reprimand does not reflect the totality of circumstances justifying Martín's later decision to prosecute. Martín recommended

28

Appellant's termination based on all of Appellant's inappropriate behavior as a "conglomeration of the whole thing" and not "one isolated event." J.A. 741:25–742:1, 743:5–6. She stated, "One event led to an investigation and that revealed multiple offenses." *Id.* at 743:6–8. Gouge's letter of reprimand was drafted in response to the offending comment on April 17, 2013. Moreover, Appellant arguably concedes reasonableness by stating that he "hope[d]" the administration would "take some sort of action, at least an investigation" in response to a complaint by a student of inappropriate conduct. *Id.* at 395:21–396:8.

Viewing the evidence in the light most favorable to Appellant, Appellant cannot show that the grounds stated in the Notice, as facts and circumstances known to Martín at the time she initiated the proceedings, would not induce a reasonable person to commence a prosecution. Therefore, summary judgment was proper on these grounds.

IV.

In light of the foregoing, the decision of the district court is

*AFFIRMED*.

29

WILKINSON, Circuit Judge, concurring:

I am pleased to concur in Judge Thacker's fine opinion. This case presents a school system personnel problem of the sort that occurs in hundreds, if not thousands, of school systems across the country every day. Here the plaintiff, a teacher, allegedly singled out two students' sexual proclivities in front of their entire AP Government class, driving the young woman involved to tears and the woman's mother to complain to school administrators.

Of course school administrators looked into it. It would have been a dereliction of duty not to do so. Their investigation revealed further inappropriate statements the teacher made to a student on Facebook, speculating about the student's possible membership in the North American Man-Boy Love Association. Whether all this conduct merited a reprimand, suspension, or termination was well within the administrators' discretion. For their efforts, they were hit with this litigation, which has been going on for over three years and in which the joint appendix alone has swelled to over 1200 pages.

I am unable to detect the slightest scintilla of educational benefit from all the churning in this lawsuit. In fact, it has drained the time of educators and the resources of a school district already burdened, as most districts are, with the steep compliance costs of federal regulation. Far be it from me to entertain the quaint notion that the efforts of educators should be spent on education, but that was assuredly not where this lawsuit directed them.

I do not think any section 1983 suit should evince such a profound lack of faith in the ability of local school systems to address their own personnel issues. There are

30

teachers, parents, principals, superintendents, school boards, and state courts and legislatures all engaged in that task. By and large, they do a fine job and draw upon community input, not just courtroom arguments.

Education has long been a matter of paramount state and local concern. While federal authority has sometimes played a crucial role, school systems have come a long way since the unlawful and immoral practice of racial segregation left federal courts with no choice but to intervene. It is high time that the federal-state balance in this area be restored, and that litigation be viewed through the prism of the progress states have made and their rightful role in our constitutional structure. Federal judges otherwise risk becoming unnecessary chefs in an overcrowded kitchen without the educational understanding or the community involvement required to achieve a palatable outcome.