**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 23-1901**

─────────────

LISA BARNHILL

        Plaintiff – Appellant,

    v.

PAMELA JO BONDI, U.S. Attorney General,

        Defendant – Appellee.

─────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, Senior District Judge.  (1:21-cv-01377-AJT-WEF)

─────────────

Argued:  December 11, 2024                    Decided:  May 15, 2025

─────────────

Before NIEMEYER, KING, and BENJAMIN, Circuit Judges.

─────────────

Affirmed by published opinion.  Judge Benjamin wrote the opinion, in which Judge Niemeyer and Judge King joined.

─────────────

**ARGUED:**  Richard Randolph Renner, NOBLE LAW FIRM, PLLC, Raleigh, North Carolina, for Appellant.  Yuri S. Fuchs, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

─────────────

DEANDREA GIST BENJAMIN, Circuit Judge:

Lisa Barnhill, a white woman, sued the United States Attorney General for discrimination she claims she suffered at the hands of, among others, her African American supervisor while she was employed by the Department of Justice Drug Enforcement Administration ("DEA"). Barnhill brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for racial and gender discrimination, retaliation, and a hostile work environment. Some claims were dismissed pursuant to Fed. R. Civ. P. 12(b)(6), while the others were disposed of on summary judgment under Fed. R. Civ. P. 56(a). Because Barnhill's attempt to spotlight her supervisor's misconduct illuminated only her own, we affirm.

I.

A.

i.

Lisa Barnhill was a longtime employee of the DEA.[1] She began her career with the DEA as a diversion investigator and held this role until April 2010, when she became a diversion program group supervisor. As a group supervisor, Barnhill oversaw diversion

---

[1] We begin by addressing the motion to dismiss. The facts stated in this section were alleged in Barnhill's first amended complaint, and we presume they are true for purposes of this section and our analysis of Barnhill's dismissed claims. *See Wilcox v. Lyons*, 970 F.3d 452, 455 n.1 (4th Cir. 2020) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)). Facts that were revealed during discovery will be addressed in section II of the opinion, as they are relevant to our analysis of the claims that were discarded on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

investigators assigned to the DEA's Little Rock, Arkansas, District Office within the DEA's New Orleans Field Division.

Initially, Barnhill reported to Joseph Shepherd, an African American man, who was the assistant special agent in charge at the New Orleans Field Division. Barnhill's second-level supervisor was Keith Brown, the special agent in charge at the New Orleans Field Division.[2] David Downing, another African American man, served as the assistant special agent in charge at the Little Rock District Office.[3]

ii.

In January 2013, Shepherd assigned Barnhill to be the acting group supervisor of the Jackson, Mississippi, District Office while maintaining her regular duties as group supervisor in Little Rock. One year later, in January 2014, Shepherd relieved Barnhill of her duties in Jackson following complaints from two African American employees, as well as ongoing performance issues with one of her subordinates.

In June 2014, Barnhill complained to Shepherd about the performance of one of her subordinates, Diversion Investigator Pamela Lee, an African American woman. Lee was subsequently placed on a preliminary performance improvement plan and denied a promotion until her performance improved. However, just a few months later, Shepherd told Barnhill that Lee was being taken off the preliminary performance improvement plan.

---

[2] The record shows that Brown is a man, but his race is unspecified. *See* J.A. 42.

[3] Each district office has its own assistant special agent in charge, but the diversion program group supervisor reports to the assistant special agent in charge in the division office, not the assistant special agent in charge in the district office. *See* J.A. 82. Therefore, Barnhill reported only to Shepherd and Brown, not Downing. *See id.*

3

When explaining the rationale behind his decision, Shepherd told Barnhill that "these people need their jobs," which Barnhill construed as a directive to show preferential treatment to African American employees. J.A. 84. Shepherd informed Barnhill that it was her responsibility, as Lee's supervisor, to provide Lee with the support necessary to meet DEA performance standards.

Around the same time, Diversion Investigator Samantha Rogers also contacted Shepherd to lodge a complaint about Barnhill. Shepherd did not discuss the complaint with Barnhill, but Barnhill alleges that Shepherd told her that he believed "she lacked the 'tools' to handle her subordinates because she was not a mother" and warned her not to continue acting as "the hammer" or she would risk becoming "the nail." J.A. 85.

In June 2015, Barnhill's relationship with Downing became strained. Shepherd therefore ordered Barnhill to cease communication with Downing, and Downing stopped inviting Barnhill to supervisors' meetings. Barnhill never understood Downing's problems with her, but requested that Shepherd and Downing have an "in-person discussion [with her] to hash out any differences." J.A. 85. Both declined her request.

At the same time, Barnhill continued to complain about Lee. Barnhill claims she did so to "ma[k]e clear. . . that she would refuse to give [] Lee preferential treatment because of her race," despite never alleging that she was ever affirmatively asked to give anyone preferential treatment at all. J.A. 87.

Later that month, Shepherd informed Barnhill that her group would undergo a "Management Review" to investigate whether she was creating a coercive or hostile work environment. *Id.* However, the review did not occur because Shepherd neglected to get

4

final approval before notifying Barnhill of the supervisors' plans and failed to initiate the review in a timely manner according to DEA policy.

On September 22, 2015, Barnhill initiated an Equal Employment Opportunity (EEO) proceeding for alleged race and gender discrimination by contacting the DEA's EEO office to request informal counseling regarding her concerns.

On October 27, Shepherd downgraded Barnhill's overall performance rating as part of the Agency's annual performance rating. Shepherd's superior, however, ordered him to upgrade the performance ratings because they were dissatisfied with the amount of documentation and the meetings Shepherd had held with Barnhill throughout the year to inform her of her deficient performance.

On November 6, Brown received written notice that Barnhill had filed her EEO proceeding. On November 17, Brown launched a management review of Barnhill and her group. Three days later, on November 20, Brown relieved Barnhill of her supervisory duties and issued her a "Temporary Duty Reassignment" to the New Orleans Division Office. J.A. 90. The reassignment required weekly travel and overnight stays in New Orleans. Brown stated that he implemented the reassignment to "allow the time for the completion of the recent management review, and . . . time to determine what, if any, actions [the DEA] w[ould] be taking as a result of the review." J.A. 90. Barnhill was reimbursed for all her travel expenses. She claimed that the reassignment remained in place until March 2016.

On December 16, 2015, Brown encouraged three of the diversion investigators Barnhill supervised, John Conner, Marcia Hawthorne, and Pamela Lee, to file EEO complaints against Barnhill. Lee later went through with filing a complaint in June 2016.

Additionally, beginning in December 2015, while the management review was still pending, Barnhill applied for several promotions at the DEA.[4] The job applications required Barnhill's supervisors to assess her fitness for the roles. Barnhill alleges that her supervisors' "ratings and comments detracted from" her application. J.A. 91.

The DEA uses a Career Board ("Board") to select candidates for management positions. Barnhill alleges that the DEA's EEO officer is a non-voting member of the Board and knew about her EEO proceeding, and that the DEA's deputy administrator is a voting member of the Board and is informed of any EEO proceedings. Barnhill further alleges that other Board members knew of her EEO proceeding and discussed it amongst each other. She claims that Brown spoke with Board members and discouraged them from selecting Barnhill. Ultimately, Barnhill was not selected for the promotions she applied for, despite being "significantly more qualified" than those who were selected. J.A. 100.

The management review of Barnhill and her group was completed on January 12, 2016. The review had twenty-one attachments supporting its findings and asserted that Barnhill had "engaged in vindictive, intimidating, and/or unprofessional conduct." J.A. 93. It maintained that Barnhill colluded with subordinates to get others fired, held up

---

[4] Barnhill continued to apply for promotions after the management review was complete.

promotions, prevented subordinates from gaining work experience, targeted particular subordinates, and called them unprofessional nicknames.

In March 2016, the Board informed Barnhill that she would be reassigned to a position working at the DEA's headquarters. But when Barnhill requested that the transfer be rescinded, the Board obliged. Barnhill was instead assigned to work at a state agency's office for six months and then transferred to another DEA office in Salt Lake City, Utah.

In July 2018, after an investigation, the DEA issued a final agency decision ("FAD") in response to Lee's June 2016 EEO complaint against Barnhill. The FAD relied heavily on the findings of the management review and concluded that Barnhill discriminated against Lee. Based on the FAD, DEA deciding official Matthew Germanowski imposed a five-day suspension on Barnhill and required her to take supplemental training on discrimination.[5]

## B.

### i.

On December 10, 2021, Barnhill filed a complaint in the United States District Court for the Eastern District of Virginia, bringing claims for race and gender discrimination, retaliation, and a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The Government moved to dismiss for failure to state a claim, which the district court granted in part and denied in part pursuant to Fed. R. Civ. P.

---

[5] The record in this matter is voluminous, and additional facts will be addressed as they become pertinent to the issues discussed in this opinion.

12(b)(6) (first dismissal order). *See generally Barnhill v. Garland*, 636 F. Supp. 3d 592 (E.D. Va. 2022).

The district court first determined that many of the employment actions that Barnhill complained of were not adverse and therefore did not engender valid claims under Title VII. *See id.* at 603–07. The court determined that the only actions that could serve as the basis for her various claims were the management review, the temporary duty reassignment, the promotion denials, and the five-day suspension imposed after the FAD.[6] *See id.* In any event, the court concluded that Barnhill failed to plead that any of the adverse actions she described stemmed from discriminatory animus related to her race or gender. *See id.* Accordingly, the race and gender discrimination claims were dismissed. *Id.* at 607.

As to the retaliation claim related to her promotion denials, the court determined that Barnhill engaged in a protected activity when she initiated her EEO proceeding in

---

[6] In *Muldrow v. City of St. Louis, Missouri*, the Supreme Court held that an adverse action for purposes of a Title VII discrimination claim is merely one that causes "some harm respecting an identifiable term or condition of employment." 601 U.S. 346, 354–55 (2024). An employee need not show that the harm was significant, serious, substantial, "or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 355. However, Barnhill did not preserve the argument that any actions aside from the management review, the temporary duty reassignment, the promotion denials, and the five-day suspension imposed after the FAD, were adverse. Although Barnhill told the court that *Muldrow* could alter the standard for Title VII claims in her reply brief (and in a supplemental letter that *Muldrow* ultimately did alter the standard), on appeal, she never affirmatively argued what else in her complaint constituted an adverse action, *and why*. Because the Government was never afforded the opportunity to respond, Barnhill has waived the argument. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop [its] argument—even if [its] brief takes a passing shot at the issue.") (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015) (internal quotation marks omitted)).

September 2015, but at no time before that. *See id.* at 607–08. The court also recognized that Barnhill did not plead facts supporting the plausible inference that the members of the Board who declined to promote her knew of her EEO proceeding or possessed any discriminatory animus toward her. *See id.* at 609 n.9. The court therefore dismissed Barnhill's retaliation claim related to her promotion denials. *See id.*

The court also dismissed Barnhill's retaliation claim related to the five-day suspension. *See id.* at 606. The court reasoned that because Barnhill did not specify who made the decision to suspend her, the court could not infer that someone possessing discriminatory animus toward her made the decision. *See id.* The court also found that the suspension could not have come as a result of discrimination because Barnhill's complaint conceded that the suspension was only imposed after the FAD found merit in Lee's claim that Barnhill discriminated against her. *See id.*

The court was persuaded, however, to allow the retaliation claims rooted in the management review and the temporary duty reassignment to proceed. *See id.* at 609. The court reasoned that the temporal proximity between the initiation of Barnhill's EEO proceeding and the management review and temporary duty reassignment, along with the fact that the temporary duty reassignment continued after the management review was complete, were probative of retaliation. *See id.* For the same reasons, the court also allowed Barnhill's hostile work environment claim to proceed. *See id.* at 609–10.

ii.

Discovery began and Barnhill moved for leave to file a first amended complaint (hereinafter "complaint"), which was granted. The complaint added allegations that

9

included Barnhill's speculation that Board members would have discussed her EEO proceeding amongst each other, and Germanowski's reliance on the FAD, which in turn relied on the management review, when imposing the five-day suspension.

While discovery was ongoing, the Government filed a second motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), seeking to dismiss all claims aside from those explicitly preserved by the first dismissal order. The district court granted the motion in full under Fed. R. Civ. P. 12(b)(6) (second dismissal order). The court dismissed the discrimination claims for the same reasons it did in the first dismissal order— none of the adverse actions Barnhill alleged stemmed from any discriminatory animus. It also dismissed the retaliation claims rooted in the promotion denials and the five-day suspension on the grounds that Barnhill failed to plead that any relevant decisionmaker possessed discriminatory animus toward her.

Barnhill timely filed a notice of appeal as to the second dismissal order and the later-issued summary judgment order.[7] The court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## C.

We first address Barnhill's appeal of the second dismissal order. This court "review[s] de novo the grant of a motion to dismiss under Rule 12(b)(6)." *Coleman v. Md.*

---

[7] To the extent that Barnhill seeks to appeal the district court's determination in its first dismissal order that she did not engage in a protected activity until her EEO proceeding, this argument was abandoned when Barnhill failed to include that order in her notice of appeal. *See Jackson v. Lightsey*, 775 F.3d 170, 176–77 (4th Cir. 2014) ("Given [the appellant's] express designation of one particular order, the fairest inference is that [the appellant] did not intend to appeal the other.").

*Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006)).  Under this standard, we assess the adequacy of the complaint by drawing all reasonable inferences in the plaintiff's favor. *Evans v. United States*, 105 F.4th 606, 616 (4th Cir. 2024).

However, "we need not accept the legal conclusions drawn from the facts, and we need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quotations omitted)). The complaint can only survive a motion to dismiss where its factual allegations, not conclusions, "raise a right to relief above the speculative level, thereby nudging the claims across the line from conceivable to plausible." *Evans*, 105 F.4th at 616 (quoting *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020) (internal quotations and citations omitted)). Barnhill's complaint fails to meet this burden.

i.

We first consider Barnhill's dismissed Title VII race and gender discrimination claims related to the management review, the temporary duty reassignment, the promotion denials, and the five-day suspension imposed after the FAD.  Because Barnhill fails to plausibly allege that any of these adverse actions were because of her race or gender, her claims must be dismissed.

To state a Title VII discrimination claim, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Coleman*, 626 F.3d at 190 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In pertinent part, Title VII prohibits an

11

employer from "refus[ing] to hire . . . or otherwise . . . discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] sex." 42 U.S.C. § 2000e-2(a)(1). As in the district court, Barnhill makes no effort on appeal to demonstrate that the complaint plausibly alleges that any relevant decisionmaker was motivated by her race or gender. Rather, Barnhill merely contends in her opening brief that the complaint's conclusory allegations of race and gender discrimination should be sufficient. *See* Br. of Appellant 29–30 (arguing that it is enough that she "claims that her race, sex and prior protected activity were each—and together—causes of the adverse actions alleged in the complaint," and that nothing in Title VII "requires her to prove any one of the bases separately, or to parse out what action was caused specifically by sex discrimination and what specifically by race discrimination").

Barnhill's theory is patently contrary to binding precedent. *See Coleman*, 626 F.3d at 190–91. Therefore, her Title VII race and gender discrimination claims fail.

ii.

Next, we address Barnhill's dismissed Title VII retaliation claims related to the promotion denials and the five-day suspension imposed after the FAD. Because Barnhill fails to allege a connection between her EEO proceeding and these adverse actions beyond mere "speculation," her claims must be dismissed. *See id.* at 191.

To support a claim for retaliation under Title VII, a plaintiff must show "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Id.* at 190 (citing *Mackey v.*

12

*Shalala*, 360 F.3d 463, 469 (4th Cir. 2004)).  The first element is satisfied by Barnhill's initiation of her EEO proceeding in September 2015.  *See Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018) (protected activities "include[] complain[ts] to superiors about suspected violations of Title VII." (internal quotation marks omitted)); *see also Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 718–21 (4th Cir. 2024) (explaining that a complaint constitutes protected activity when it is based on allegations of discrimination based on race, gender, and other categories falling within the scope of Title VII).  The second element is not in dispute as the parties agree that the promotion denials and the five-day suspension imposed after the FAD constitute adverse actions under Title VII.  *See supra* n.6.  Therefore, all that is left to decide is whether Barnhill's complaint fell short of establishing a causal connection between her protected activity and the adverse actions she alleged.  For the reasons outlined below, it did.

While there is not a bright-line rule instructing when temporal proximity is sufficient to establish causation, without other evidence of causation, the gap between the protected activity and the adverse employment action can generally be no longer than two months.  *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021).  In any event, the plaintiff must show that a relevant decisionmaker was actually aware of the protected activity before making their decision.  *See id.* at 124 (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).  With respect to the promotion denials and the five-day suspension, temporal proximity does not weigh in Barnhill's favor.  The complaint alleges that the first promotion denial did not occur until March 2016—almost six months after Barnhill's EEO proceeding was initiated.  And the

13

five-day suspension was not imposed until July 2018, almost three years after Barnhill's EEO proceeding was initiated. Therefore, the temporal proximity between the EEO proceeding's initiation and the adverse employment actions at issue does not satisfy the causation element of Barnhill's retaliation claims.

However, even in the absence of temporal proximity, causation can be established through a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity. *See e.g.*, *Barbour v. Garland*, 105 F.4th 579, 593–94 (4th Cir. 2024); *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) (causation established where supervisor told plaintiff that they "would be involved" in their EEO complaint); *Lettieri v. Equant Inc.*, 478 F.3d 640, 650–51 (4th Cir. 2007) (causation established where plaintiff was stripped of multiple job responsibilities before ultimately being fired for an illegitimate reason).

In *Barbour*, a plaintiff alleged that the DEA retaliated against her by denying her employment as a special agent after discovering her participation in a class action lawsuit against the FBI. *See* 105 F.4th at 593–94. The court determined that the plaintiff's allegations regarding the period between when the DEA learned of her lawsuit and when the plaintiff finally discovered that she had not been hired plausibly established causation. *See id.* at 593–94, 597. The court found that DEA agents' incessant questioning of Barbour about the FBI lawsuit and the difference in how her application was handled after the DEA learned of the lawsuit were highly suggestive of "retaliatory animus." *See id.* Barbour's application was suddenly stalled despite previously being expedited, her background check was reopened, she received varying information about her application from DEA agents,

14

previously helpful agents ceased communicating with her, and she was not notified when she was not selected for the role. *See id.* at 593–94. This sequence of events suggested that there was a causal connection between the lawsuit and the DEA's denial of Barbour's application. *See id.* at 597–98. The court therefore found it "plausible" that the DEA retaliated against Barbour for filing the lawsuit despite the "six- to eight-month lapse" in time. *Id.* at 591, 596–97.

*Barbour*'s principles are inapplicable here. First, unlike *Barbour*, Barnhill does not allege that she was treated favorably before the DEA gained knowledge that she had initiated an EEO proceeding. *See also Lettieri*, 478 F.3d at 650 (discriminatory acts began after filing of complaint). Instead, Barnhill alleges that she repeatedly suffered discrimination *before* the initiation of her EEO proceeding. Therefore, Barnhill cannot meritoriously argue that the initiation of the EEO proceeding caused her to be treated differently. *See Francis v. Booz*, *Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("The actions that led to [the plaintiff's] probation and termination began *before* her protected activity, belying the conclusion that a reasonable factfinder might find that [the employer's] activity was motivated by [her] USERRA complaints."); *see also Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021) (holding that a reasonable factfinder could find that a protected activity brought about adverse actions where adverse actions were not "gradual" and did not begin "well before" the protected activity).

Second, unlike in *Barbour*, where the plaintiff was "repeated[ly] and obsessive[ly] question[ed]" about her lawsuit, Barnhill never alleges that anyone at the DEA ever asked

15

her about the EEO proceeding or that she was ever coerced into discussing it with anyone at the DEA. *Cf. Barbour*, 105 F.4th at 593.

Nor is this case like *Holloway*. There, the plaintiff's employer "exclaimed" that they were aware of the plaintiff's EEO complaint and implied they would interfere with the proceedings by stating they "would be involved." *See Holloway*, 32 F.4th at 300. Here, Barnhill never alleges that anyone at the DEA told her that they would be tampering with her EEO proceeding. *Cf. id.*

Third, unlike the plaintiff in *Barbour*, Barnhill's complaint is riddled with allegations of discrimination and misconduct on her part that caused contemporaneous responses from the DEA, both before and after the initiation of her EEO proceeding. Therefore, to the extent that there were any suggestive events that occurred between her protected activity and alleged adverse employment actions, Barnhill can hardly establish more than a remote and tenuous connection between them, if any. For these reasons, *Barbour* and its affiliated cases cannot help Barnhill.

Barnhill nevertheless argues that she can establish causation, including through the "cat's paw" theory. She cannot.

In *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277 (4th Cir. 2004), the court explained that, in certain rare instances, the discriminatory animus of an employee can be imputed onto the employer to establish causation—known as the "cat's paw" theory. *See* 354 F.3d at 290–91 (en banc). To satisfy the cat's paw theory at the motion to dismiss stage, a plaintiff must plead that a coworker harboring discriminatory animus toward her exercised authority over an adverse employment action that the plaintiff

16

suffered such that the colleague should be viewed as the "actual decisionmaker" principally responsible for the adverse action. *See id*; *see also e.g.*, *Roberts v. Gestamp W. Virginia, LLC*, 45 F.4th 726, 739 (4th Cir. 2022) (theory unsatisfied where a subordinate employee harboring discriminatory animus lacked decision-making authority, irrespective of them substantially influencing the decisionmaker); *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 410–11 (4th Cir. 2013) (theory unsatisfied where a discriminating employee substantially influenced the actual decisionmaker, but was not principally responsible for the decision); *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 356 (4th Cir. 2013) (theory unsatisfied where a problematic supervisor had no role in the adverse action the plaintiff suffered); *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 343 (4th Cir. 2008) (theory unsatisfied where the complained of employee was not even involved in discussions pertaining to the adverse action the plaintiff suffered, let alone in charge of making the decision).

In *Bandy v. City of Salem, Virginia*, 59 F.4th 705 (4th Cir. 2023), the court provided guidance regarding a plaintiff's burden when she attempts to satisfy *Hill*'s standard through a decision-making committee, as opposed to an individual. *See Bandy*, 59 F.4th at 705. The court recognized that a plaintiff could satisfy *Hill*'s standard where committee members exercising authority over an adverse action the plaintiff suffered acted together in making the decision. *See id.* at 708, 710–11. Nevertheless, the court still required the plaintiff to show that the committee members harbored discriminatory animus toward them, as opposed to merely implementing an action adverse toward the plaintiff. *See id.* at 711–12.

17

Regarding the promotion denials, Barnhill cannot make use of the cat's paw theory because she failed to plausibly allege that Brown or any Board member possessing discriminatory animus toward her was the "actual decisionmaker" over the adverse employment actions she suffered. *See Hill*, 354 F.3d at 290–91. Nor did Barnhill plausibly allege that the Board members collectively harbored discriminatory animus toward her. *See Bandy*, 59 F.4th at 711–12.

Barnhill did allege that the DEA's EEO officer is a non-voting member of the Board and knew about her EEO proceeding, and that the DEA's deputy administrator is a voting member of the Board and is informed of all EEO proceedings. She also alleged that Brown possessed discriminatory animus toward her, told Board members about her EEO proceeding, and encouraged them to vote against her. She further alleged that Board members spoke amongst each other about the EEO proceeding.

However, ruling in Barnhill's favor would require *assuming* that someone with both principal authority and discriminatory animus decided not to select Barnhill for the promotions, without the complaint leading to such an inference. As a result, Barnhill's allegations do not "rise above" mere "speculation," *Coleman*, 626 F.3d at 191, and her Title VII retaliation claims based on her promotion denials fail.

As to the five-day suspension, Barnhill never alleged that the relevant decisionmaker possessed any discriminatory animus. *See Hill*, 354 F.3d at 290–91. The suspension was imposed by Germanowski, the DEA's deciding official, after the FAD revealed that Barnhill had discriminated against Lee. Nowhere in Barnhill's complaint did she allege that Germanowski possessed discriminatory animus toward her or that he

18

discriminated against her in any way. Thus, while Germanowski was the sole decisionmaker over the suspension, Barnhill's failure to allege discrimination on his part eliminates any pathway for establishing causation as to this adverse action. Therefore, Barnhill's Title VII retaliation claim related to her five-day suspension also fails.[8]

For these reasons, we affirm the dismissal of Barnhill's Title VII race and gender discrimination claims, as well as her Title VII retaliation claims related to the promotion denials and the five-day suspension imposed after the FAD.

## II.

The district court resolved the remaining claims on summary judgment under Fed. R. Civ. P. 56(a), including the retaliation claims related to the management review and temporary duty reassignment, as well as the hostile work environment claim. We now address these claims and, likewise, affirm.

---

[8] Barnhill also argues that the suspension was the DEA's first opportunity to retaliate against her. *See Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) ("[T]he employer's knowledge coupled with an adverse action taken at the first opportunity satisfies the causal connection element of the prima facie case."). First, this argument is contradicted by Barnhill's own assertion that the management review, temporary duty assignment, and promotion denials—which all predated the five-day suspension—were retaliatory acts as well. This differs from *Barbour*, where the plaintiff pled that the denial of her application was the first time the defendants could have retaliated against her, and the defendants asked the court to infer that they could have retaliated against the plaintiff sooner had they been inclined to do so. *See Barbour*, 105 F.4th at 594–97. Second, the fact that Barnhill never alleged that Germanowski—the individual who imposed the suspension—knew of her EEO proceeding or harbored any discriminatory animus toward her further renders this argument unviable. Third, this court has already held that the first opportunity doctrine is "specific to the failure-to-hire context"; therefore, it cannot apply to Barnhill's five-day suspension. *See Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 657 (4th Cir. 2017).

A.

During discovery, the factual record was developed.[9]  Discovery revealed that complaints about Barnhill's discriminatory conduct and harsh managerial style began trickling in less than two years into Barnhill's tenure as group supervisor.  In February 2012, Diversion Investigator Kelli Geary sent Shepherd a detailed letter explaining how Barnhill "targeted" her with "constant criticism" such that she was "afraid" to do her job. J.A. 204.  Lee, whom Barnhill had complained about to Shepherd, also alleged that Barnhill "scolded" her incessantly, J.A. 208, scrutinized her work harder than others, denied her a promotion, and told other employees that she wanted her to quit.    J.A. 207–08. Furthermore, Barnhill's own affidavit revealed that Downing's issues with her did not arise out of thin air, as her complaint suggests.  Rather, Barnhill herself stated that Downing took issue with her mishandling of a diversion case and that he believed she could not be trusted.

Discovery also revealed that on October 12, 2015, Shepherd emailed a draft of Barnhill's annual performance review to his assistant.  But this draft was incomplete, lacking an overall rating, official rating comments, or a signature.  As stated in the complaint, on October 27, Shepherd sent Barnhill a revised performance rating, which was much more critical of her performance.  Shepherd explained that the initial version was merely a "shell" containing information from previous years. J.A. 778.  The initial draft

---

[9] Unless otherwise stated, the facts alleged in the complaint were corroborated during discovery.

20

was thus an unfinalized document, immaterial to Shepherd's assessment of Barnhill's performance throughout 2015. *Id.*

Separately, around this time, Anthony Lemons began serving as acting assistant special agent in charge in place of Shepherd.[10] Upon assuming this role, Lemons, too, was bombarded with complaints about Barnhill from Conner, Hawthorne, and Lee. On different occasions, Barnhill's subordinates complained to Lemons about her "targeting and harassment." J.A. 330. They said they were "distraught" and "contemplating leaving their positions" if things did not change. *Id.*

On October 7, 2015, Lemons reported these complaints to Brown and requested that a management review be conducted "as soon as possible" to address the "major morale issues" in Barnhill's group. *Id.* On November 17, in accordance with Lemons' request, Brown launched a management review of Barnhill and her group.

In light of the management review, Brown relieved Barnhill of her supervisory duties and issued her a "Temporary Duty Reassignment" to the New Orleans Division Office just three days later, on November 20. J.A. 90, 496. Brown's letter to Barnhill confirmed that the reassignment required weekly travel and overnight stays in New Orleans. Brown did, however, make clear that the reassignment was not intended to be punitive; rather, it was implemented to "allow the time for the completion of the recent management review, and . . . time to determine what, if any, actions [the DEA] w[ould] be taking as a result of the review." J.A. 496. Barnhill was reimbursed for all her travel

---

[10] The record does not provide the precise date on which Lemons entered this role.

expenses. The reassignment remained in place until February 2016, a month prior to what Barnhill's complaint suggests.

The management review was finalized on January 12, 2016, and it elaborated on Barnhill's discriminatory conduct and behavior in great detail. Specifically, it summarized the thirteen interviews the DEA conducted and the twenty-one documents it discovered during the investigative process. The review confirmed that Barnhill had created a "caustic, repressive, and obstructionist work environment," and that "[e]very single person interviewed" who was supervised by Barnhill stated that she "engaged in vindictive, intimidating, and/or unprofessional conduct." J.A. 352. It also unveiled Barnhill's specific targeting of female subordinates and her refusal to provide adequate training for new employees. The review recommended, among other things, that Barnhill be removed from her supervisory position in Little Rock and undergo extensive professional training.

The FAD itself also provided additional context beyond what Barnhill had stated in her complaint. The FAD exposed that Barnhill had discriminated against Lee on the basis of her race and sex for years. It concluded that Barnhill engaged in "pervasive harassment" and subjected Lee to a "hostile and abusive" work environment. J.A. 610. The FAD relied in part on the management review, which found that Barnhill "targeted new Diversion Group employees and bullied and intimidated them to maintain control." J.A. 602. And based on the FAD, Germanowski did impose a five-day suspension on Barnhill and required her to participate in supplemental training on discrimination.

B.

22

Based on the factual development during discovery, the district court disposed of the remaining claims on summary judgment under Fed. R. Civ. P. 56(a)—the retaliation claims based on the management review and temporary duty reassignment, and the hostile work environment claim. *See generally Barnhill v. Garland*, No. 1:21-cv-1377-AJT-WEF, 2023 WL 4873641 (E.D. Va. July 31, 2023). As to the management review, the court determined that record evidence confirmed that the review was initiated by Lemons, whom Barnhill never alleged discriminated against her. *See id.* at *3–4.

As for the temporary duty reassignment, the court ruled that even if it assumed that Brown, who imposed the reassignment, possessed discriminatory animus toward Barnhill, it could not conclude that the reassignment was implemented for illegitimate reasons. *See id.* at *4–6. Considering the large number of complaints made against Barnhill, the initiation of the management review, and Brown's detailed letter explaining why the reassignment was imposed, the court found that no genuine issue of material fact existed regarding the purpose of the reassignment. *See id.* at *4–6. The court concluded that the reassignment was clearly imposed "to limit any potential conflicts that might arise if Barnhill were in the office while the management review was underway." *Id.* at *4.

As to the hostile work environment claim, the court determined that Barnhill's failure to show that any relevant decisionmaker possessed discriminatory animus toward her, or a connection between her EEO proceeding and the adverse actions, belied her claim. *See id.* at *4. The court concluded that the allegations on which the hostile work environment claim were based were "simply too trivial or generalized to constitute either an adverse action or severe and pervasive harassment." *Id.* at *4 n.4.

23

C.

This court reviews a district court's grant of summary judgment under Fed. R. Civ. P. 56(a) *de novo*. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 259 (4th Cir. 2005). Summary judgment is appropriate when the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the nonmoving party is entitled to all reasonable, non-speculative inferences drawn in her favor, such inferences must be justifiable from the evidence, and the nonmoving party must present "significantly probative"—not "merely colorable"—evidence in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 254 (1986). Like Barnhill's dismissed Title VII retaliation claims, her failure to prove causation defeats her Title VII retaliation claims rooted in her management review and temporary duty reassignment.

i.

Barnhill's claim based on the management review fails because discovery revealed that the management review was initiated by Lemons. On the one hand, temporal proximity weighs in Barnhill's favor because the management review was initiated less than a month after the EEO proceeding was initiated. *See Roberts*, 998 F.3d at 127 (explaining that the inference of causation does not begin to weaken until two months have passed between the protected activity and adverse action). But the lack of evidence that Lemons knew of the EEO proceeding before initiating the management review forecloses temporal proximity as a pathway to establishing causation. *See id.* at 124–27 (explaining

24

that irrespective of temporal proximity, a plaintiff must show that a relevant decisionmaker knew of their protected activity at the time of the adverse action to establish causation).

Secondly, *Barbour*'s principles cannot help Barnhill because neither the complaint nor the record contains any suggestive intervening events between the initiation of the EEO proceeding and when Lemons called for the management review. *See Barbour*, 105 F.4th at 593–94, 597 (explaining that suggestive intervening events can bridge a prohibitively long temporal gap and establish causation). Lastly, like Germanowski, there is no indication that Lemons ever possessed any discriminatory animus toward Barnhill.

Barnhill contends that we can reach a different conclusion if we find that Brown initiated the management review. She argues that if we view the record this way, causation could be established via temporal proximity because Brown began the management review within two months of learning of the EEO proceeding. *See Roberts*, 998 F.3d at 127. But the record unambiguously reveals otherwise. The management review, as well as both Brown and Lemons, assert that the review only came about because of Lemons' directive to initiate it. Indeed, when he ordered the review, Lemons was Barnhill's direct supervisor and therefore responsible for overseeing her leadership of the group she managed in Little Rock. And after receiving complaints from three of Barnhill's subordinates, Lemons did what most responsible supervisors would under the circumstances: he requested that an investigation into the allegations take place. We therefore decline Barnhill's invitation to construe the record in an erroneous fashion and affirm the district court's grant of summary judgment as to Barnhill's Title VII retaliation claim based on the management review.

ii.

25

The temporary duty reassignment is more complicated.  Under the burden shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), once a plaintiff makes a prima facie showing of a retaliation claim, the burden shifts to the employer to offer a legitimate, nonretaliatory reason for their adverse action.  *See Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 63 (4th Cir. 2023) (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)); *Decoster v. Becerra*, 119 F.4th 332, 342–43 (4th Cir. 2024).  If the employer meets this burden, "the burden then shifts back to the . . . [employee] to prove by a preponderance of the evidence" that the employer's purported reason is pretext for intentional retaliation.  *See Palmer*, 72 F.4th at 63.

The record indicates that Brown instituted Barnhill's reassignment to the New Orleans office on November 20, 2015, just two weeks after learning of the EEO proceeding on November 6, 2015.  Thus, Barnhill has made out a prima facie case of retaliation under Title VII because temporal proximity satisfies the causation prong of the analysis.  *See Roberts*, 998 F.3d at 124–27 (explaining that close temporal proximity between the protected activity and the adverse action coupled with a relevant decisionmaker's knowledge of the protected activity at the time of the adverse action establishes causation).

However, the record shows that Brown had a legitimate reason for instituting the reassignment, and so the retaliation claim grounded in the reassignment also fails.  The record reveals that Barnhill was given the reassignment in response to the management review, which had begun three days prior.  The objective behind the reassignment was to

26

remove Barnhill from her group in Little Rock while it was being investigated to prevent any intermeddling or unnecessary hostility.

Barnhill cannot prove that Brown's reason for instituting the reassignment is pretext for intentional retaliation.  Barnhill points out that a management review was not initiated when Shepherd requested it in June 2015, but was a couple of months after she commenced her EEO proceeding.  She further contends that the record does not show any misconduct on her part between June 2015 and October 2015 that would justify the management review.  She also claims that there is a lack of evidence as to Lemons' request for the management review and that the review was mishandled in several ways, which indicates that it was initiated on baseless grounds.  Lastly, she argues that the temporary duty reassignment lasting beyond the completion of the management review is evidence of pretext.

Simply put, these contentions fall short of genuinely disputing the record's attestation that the DEA had legitimate, nonretaliatory reasons for instituting the reassignment.  *See Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 794 (4th Cir. 2023) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)) ("[W]hen an employer gives a legitimate, nondiscriminatory reason for terminating an employee, it is not our province to decide whether the reason was wise, fair, *or even correct*, so long as it was *the genuine reason* for the employment decision." (internal quotation marks omitted)).  The problem with all but one of Barnhill's arguments is that they are directed at the validity of the management review, not the temporary duty reassignment.  But the two are separate from one another.  While it is true that the temporary duty reassignment came in response to the

27

management review, it would have been imposed irrespective of whether the management review found Barnhill guilty or innocent of the allegations against her. This is because the temporary duty reassignment was not intended to punish Barnhill, but to prevent her from having contact with members of her group while the management review was taking place. And the need to keep Barnhill away from her group would have been apparent whether the allegations against her were meritless or meritorious.

Barnhill's other argument—that the temporary duty reassignment being extended beyond the completion of the management review is evidence of pretext—is specious. If there was ever any doubt as to whether Barnhill should have been separated from her group when the management review was initiated, any such doubt was certainly removed once the review was complete.

As previously stated, the management review detailed a "caustic, repressive, and obstructionist work environment" in Barnhill's group. J.A. 352. It revealed that each of Barnhill's subordinates were suffering from low morale, and that Barnhill engaged in "vindictive, intimidating, and/or unprofessional conduct." *Id.* It also exposed that she specifically targeted female subordinates and refused to provide adequate training for new employees. Therefore, after the management review was complete, the DEA had an even greater reason for keeping Barnhill out of the Little Rock office and far away from her group.

Furthermore, the reassignment lasting beyond the completion of the management review aligns with what Brown told Barnhill when he issued the reassignment. Brown informed Barnhill that the reassignment was not only in place to allow time for the

28

management review to be completed, but also to give the DEA time to figure out the best course of action once the results of the management review were released. *See* J.A. 90, 496 (articulating that the reassignment was implemented to "allow the time for the completion of the recent management review, and . . . time to determine what, if any, actions [the DEA] w[ould] be taking as a result of the review."). It should therefore have come as no surprise that the reassignment lasted until February 2016, as that was the same month that the DEA decided where it wanted to transfer Barnhill after the results of the management review were released. Because Barnhill cannot show that Brown's reason for implementing the temporary duty reassignment was pretextual, her retaliation claim related to the reassignment fails.

iii.

Barnhill's hostile work environment claim under Title VII was also disposed of on summary judgment under Fed. R. Civ. P. 56(a). To succeed on such a claim a plaintiff must show " '(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.' " *Strothers*, 895 F.3d at 328 (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). To satisfy the third element of the claim, a plaintiff must show that they were placed in a "retaliatory hostile work environment . . . *so severe or pervasive* that it would dissuade a reasonable worker from making or supporting a charge of discrimination." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 217 (4th Cir. 2022) (emphasis added). This

29

high burden cannot be satisfied by claims based on "petty slights or minor annoyances." *Id.* at 218 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

In *Laurent-Workman*, the court held that the plaintiff had adequately pled the third element of her hostile work environment claim by alleging that one of her supervisors became even more hostile towards her after she complained to her supervisors about a coworker's blatantly racist comments. *See id.* at 207–09, 218. The supervisor's acts of hostility involved "a series of unpredictable management decisions and acts of sabotage." *Id.* at 218. They "ranged from erroneous reprimands to bogus denials of professional training opportunities to the alteration of work product in a manner damaging to Laurent-Workman's reputation, on top of additional meddling." *Id.* The court held that any one of these actions may not have been enough to satisfy the third element of the claim "when considered in isolation," but together, "the allegations t[old] a multi-act story of undermining, gaslighting, and disruption[,]" which satisfied the element. *Id.*

Because any unwelcomed conduct that Barnhill suffered was limited and far from abusive, she cannot satisfy the third element of the claim. The fundamental difference between *Laurent-Workman* and this case is that here, every adverse action that Barnhill complains about came in response to her own bad behavior—not her complaints about others. Whether it be the exclusion from supervisor meetings, management review, temporary duty reassignment, promotion denials, the five-day suspension, or the complaints filed against her, Barnhill cannot point to a single action that did not stem from her own behavior.

30

In sum, the record demonstrates that Barnhill's supervisors never instigated strife between themselves and Barnhill but merely responded to Barnhill's own behavior toward her subordinates. Therefore, the acts were no different than ones "all employees experience" when they are alleged to have engaged in misconduct as egregious as that which Barnhill is linked to in this case. *Id.* at 218 (quoting *Burlington N.*, 548 U.S. at 68).

## III.

Barnhill sued for discrimination she claims she suffered while working at the DEA. As to the claims that were dismissed, Barnhill failed to plead the necessary elements of her claims. As for the remaining claims, the record shows that it was Barnhill's own behavior that gave rise to the adverse actions she experienced. For the foregoing reasons, the decision of the district court is

*AFFIRMED.*