**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-2218**

_____

MONICA ANDREWS,

             Plaintiff - Appellant,

    v.

LOUIS DEJOY, Postmaster General, U.S. Postal Service,

             Defendant - Appellee.

_____

Appeal from the United States District Court for the Western District of Virginia, at Big Stone Gap.  James P. Jones, Senior District Judge.  (2:22-cv-00028-JPH-PMS)

_____

Submitted:  November 19, 2025                    Decided:  January 9, 2026

_____

Before WILKINSON, AGEE, and THACKER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ON BRIEF:**  A. Marques Pitre, PITRE & ASSOCIATES, LLC, Washington, D.C., for Appellant.  C. Todd Gilbert, United States Attorney, G. Riley Worrell, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Monica Andrews ("Appellant") brought this action against her former employer, the United States Postal Service ("USPS"), alleging that her supervisor retaliated against her in violation of Title VII of the Civil Rights Act of 1964, after she filed administrative complaints against him. The district court granted summary judgment against her, and Appellant now appeals that decision.

We conclude that Appellant failed to meet her burden of establishing a prima facie case of retaliation and further failed to demonstrate that the USPS's reasons for terminating her were pretextual. Therefore, we affirm the district court's grant of summary judgment.

I.

Appellant, a Black woman, has worked for the USPS in various locations since 2017. In November 2019, she transferred to Norton, Virginia as a part-time Sales and Services/Distribution Clerk. Two months after Appellant started that position, Dennis Ley, a white male, was appointed as the postmaster at Norton.

According to Appellant, Ley displayed "super aggressive," "combative," and "intimidating" behavior toward her "from the beginning." J.A. 667.[*] This sentiment was shared among other employees at the Norton branch who described him as "speak[ing] extremely hateful[ly] to clerks and carriers" and complained of his "rude, unprofessional, and confrontational" approach. *Id.* at 282–86.

---

[*] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

The issues between Appellant and Ley began almost immediately.  In early February 2020, Ley confronted Appellant over her alleged tardiness, improper use of her cell phone, uniform compliance, and other issues he deemed to be unsatisfactory job performance. These issues led to Appellant emailing Ley's supervisor to report "workplace bullying by a supervisor."  J.A. 456.

Tensions between the two came to a head on February 21, 2020, in an incident about which they have differing accounts.  According to Ley, he saw Appellant stacking parcels unsafely on a table so that she was creating a stack that was higher than her head.  And when he inquired about it, she "became loud and disrespectful," began recording Ley on her phone and would not stop, and then would not leave the post office until Ley ordered her to clock out and do so.  J.A. 464–65.  According to Appellant, though, Ley called the police simply because, after he asked to give her a pre-disciplinary interview, she asked for a union steward to be present during the interview.  It is undisputed, however, that as a result of the encounter, Ley ordered Appellant to leave the premises, she refused, and he called the police to escort Appellant from the building.  Ley subsequently placed Appellant on emergency placement -- a form of off-duty status without pay that continues until further notice -- for disobedience.

The following day, Appellant filed an informal complaint with the Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination and a hostile work environment.  Three days later, on February 25, Appellant was issued a seven day suspension, to run from March 14 to March 21, 2020.  While this occurred soon after

3

the police incident, the suspension stemmed from Appellant's attendance issues during the month of February.

On March 18, Ley was notified via email from the EEOC that he had "been named in an EEOC claim filed by [Appellant]." J.A. 470. Appellant's return to work from her emergency placement and suspension came four days later, on March 22. Then, on March 24, Ley began taking notes on his interactions with Appellant. According to Ley, he began to take notes about Appellant in order to document her "performance issues," as well as her perceived failures to respond to correction or adhere to certain policies. *Id.* at 313. In his deposition, Ley explained that he did not take notes about any other employees because he was not having such performance issues with anyone else. And although Ley testified during his deposition that he was not aware of the EEOC claim against him at the time he began taking the notes, he replied to the March 18 email a few hours after it was sent asking the EEOC specialist to let him know if any additional information was needed from him.

A few days after Ley began taking notes with respect to Appellant's job performance, he asked his supervisor to deactivate Appellant's work email account because according to Ley, Appellant's access to her email "was not needed or required for her position at the time frame that she was working." J.A. 320. Of note, it was with this email account that Appellant reported Ley for workplace bullying in February. However, it is undisputed that Appellant did not need to access email to perform any of her job duties.

Ley's concerns with Appellant's performance continued through May and into June, during which time he issued her another suspension on May 21 to run from June 6 to June 19. But on June 11, Ley conducted another pre-disciplinary interview with Appellant, once

4

again discussing her job performance issues, including uniform noncompliance, failure to report to work, and other performance problems.

The issues discussed in that interview formed the basis of the Notice of Removal -- a notice that she was being terminated -- that Ley issued to Appellant on June 22. But as a result of union contracted arbitration, this disciplinary measure was subsequently mitigated to a multi-day suspension, and Appellant was reinstated with back pay.

Thereafter, Appellant filed the complaint that forms the basis of this appeal, raising three claims pursuant to Title VII: race discrimination, a hostile work environment, and retaliation. In her opposition to the USPS's motion for summary judgment, Appellant withdrew her claim of race discrimination. And the district court granted summary judgment in full in favor of the USPS on the remaining claims.

On appeal, Appellant challenges the dismissal of only one of her original claims: her Title VII retaliation claim. Appellant asserted that Ley began retaliating against her after learning of her EEOC complaint by issuing suspensions, unfairly accusing her of workplace performance issues, and terminating her employment. The district court granted summary judgment to the USPS after concluding that Appellant had failed to show a causal connection for purposes of her prima facie case of retaliation and that, even if she had, she had not shown that the nondiscriminatory grounds the employer provided for its actions were pretextual.

Appellant now challenges that grant of summary judgment on appeal.

II.

"We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in favor of the nonmoving party." *Schulman v. Axis Surplus Ins. Co.*, 90 F.4th 236, 243 (4th Cir. 2024); *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

A.

Title VII prohibits an employer from retaliating against their employee for complaining about prior discrimination or retaliation. A plaintiff may prove their Title VII retaliation claim through either direct and indirect evidence of retaliatory animus, or through the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

In the present appeal, Appellant invokes the *McDonnell Douglas* framework. Per that framework, a plaintiff must first establish a prima facie case by showing that: (1) she engaged in protected activity; (2) the employer took adverse action against her; and (3) a causal relationship existed between the protected activity and the adverse employment action. *Foster*, 787 F.3d. at 250; *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2024). Once the plaintiff establishes her prima facie case, the burden shifts to the defendant to prove that any adverse action was taken for a legitimate non-retaliatory reason. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). And if the defendant carries

6

this burden, the burden shifts back to the plaintiff to then demonstrate that the proffered non-retaliatory reasons for the adverse action were instead pretext for discrimination. *Id.*

In establishing the causal relationship element, a plaintiff may demonstrate that a protected activity caused an adverse action through either one of two routes: (1) by establishing a "temporal proximity between the protected activity and adverse action," or (2) by establishing that "other relevant evidence indicates 'continuing retaliatory conduct and animus' toward the plaintiff." *Alberti v. Rector and Visitors of the Univ. of Va.*, 65 F.4th 151, 156 (4th Cir. 2023) (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)).

Therefore, the absence of temporal proximity alone is not fatal, as courts "may look to the intervening period for other evidence of retaliatory animus." *See Lettieri*, 478 F.3d at 650 (internal quotation marks omitted) (providing that the existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action). But, before any of this is established, the plaintiff must, as a threshold matter, "demonstrate that the decisionmaker imposing the adverse action ha[d] actual knowledge of the protected activity." *Roberts*, 998 F.3d at 125.

### B.

At the outset, the USPS argues that Appellant's opening brief has waived review of the district court's order by failing to develop a legal argument as to why the record could support a favorable jury determination as to either a prima facie case of retaliation or pretext. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A

party waives an argument by failing to present it in its opening brief or by failing to develop [its] argument—even if [its] brief takes a passing shot at the issue.") (internal quotation marks omitted) (alterations in original) (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015)).  Instead, while Appellant's brief excessively recites record facts, it relegates the handful of legal principles to cursory footnotes, as if the facts create a self-evident question for the jury.  *See* Fed. R. App. P. 28(a)(8)(A) (requiring an appellant's brief to contain their "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *see also Moreno v. Bosholm*, 151 F.4th 543, 558 (4th Cir. 2025).  And Appellant does not attempt to address either of the district court's alternate holdings—failure to establish a prima facie case or failure to demonstrate pretext—until her reply brief.

While we recognize the USPS's waiver argument, we need not rely on it because the record overwhelmingly supports the district court's judgment.

C.

As to the merits of her retaliation claim, Appellant argues that Ley's notetaking after he learned of Appellant's EEOC claim is evidence of "continuing retaliatory conduct and animus," *Alberti,* 65 F.4th at 156, and that the subsequent adverse actions were the "result of increased scrutiny" due to the filing of her EEOC claim.  Appellant's Opening Br. at 12.  Appellant further argues that when Ley began taking notes regarding Appellant, he was "doing so under the guise of preparing to remove her from the Agency." *Id*.

Appellant points to *E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397 (4th Cir. 2005) in support of her arguments.  There, the record established an elaborate and explicit

plan by the employer to subject the employee to "heightened scrutiny" in an effort to terminate the employee in retaliation for her complaints of racial discrimination. *Id.* at 407. Shortly after the employee in *Navy Federal* filed her discrimination complaint, evidence in the record reflected a scheme by the employer to: (1) "give [the employee] favorable performance evaluations, which could be used to defend [the employer's] actions in subsequent litigation; and (2) to heighten scrutiny of [the employee's] activiti[es] in order to discover an objective and legitimate basis for her termination." *Id.* at 402. Due to this overwhelming evidence, we concluded the plaintiff in *Navy Federal* established a prima facie case of retaliation because the heightened scrutiny and favorable evaluations were "part and parcel of [the employer's] plan to fire [the plaintiff] for unlawful reasons and to cover up those reasons with pretextual charges." *Id*. at 407.

Appellant contends *Navy Federal* is dispositive here because the notetaking by Ley following his discovery of Appellant's EEOC claim establishes that the "heightened scrutiny" she was under was "part and parcel of its larger plan to fire [Appellant] for unlawful reasons." Appellant's Opening Br. at 13. In the alternative, Appellant posits that Ley's contradicted testimony during his deposition that he was not aware of Appellant's EEOC claim when he began taking notes on her creates an inference of retaliatory motive. We disagree with both arguments.

Here, the record is replete with Appellant's documented performance issues pre-dating both Ley's joining the Norton branch and Ley's learning of Appellant's EEOC complaint. For example, in July 2019, Appellant was issued a Letter of Warning for "unsatisfactory performance and improper conduct," pre-dating Ley's joining the Norton

9

branch. J.A. 386. Then, starting in February 2020, following Ley's employment at the Norton branch, Appellant was documented for the following performance issues:

- Arriving late without notice on February 1, 10, 11, and 15 --leading to a seven day suspension on February 25;

- "[I]mproper conduct/unsatisfactory performance window/sales functions" on February 10 and 12, J.A. 386;

- "[I]mproper conduct [and] improper cell phone use at work" on February 11, *id.*; and

- "[F]ailure to follow instructions and insubordination" on February 21, leading to another seven day suspension, *id.* at 676.

These performance issues all occurred before March 18 -- the day the record shows that Ley was made aware of Appellant's EEOC complaint. And, although Appellant offers a different view of some of her perceived deficiencies or explanations for them, she never challenges the fundamental validity of the deficiencies in her work documented by Ley. Indeed, the record reflects that she was suspended for much the same performance and compliance concerns *before* Ley learned of her complaint as she was after he learned of it. For example, on May 21, following multiple discussions between Appellant and Ley regarding Appellant's insubordination, failure to follow instructions, and other unsatisfactory job performance, Ley issued Appellant a fourteen day suspension. And it was during this suspension that Ley and Appellant held their final pre-disciplinary interview regarding her job performance issues that formed the basis of Appellant's termination. Thus, because Appellant's performance issues -- documented *before* and *after* Ley knew of her EOOC complaint -- supported her eventual termination, there is nothing to suggest it was retaliatory.

10

Moreover, none of the things Appellant points to as creating a question of causation or pretext do so. For example, no retaliatory motive can be inferred from the simple act of Ley's notetaking or his faulty memory -- at a deposition taken years later -- concerning when he became aware of Appellant's complaint. Nor do the nature of the notes suggest that Ley reviewed Appellant with a higher level of scrutiny after learning of the EEOC complaint than he had before. And while Ley's decision to have Appellant's email address deactivated may have been arbitrary, it is undisputed that this act did not affect her ability to do her job successfully. Indeed, Appellant admitted she did not need email access for any job related purpose. Accordingly, that act cannot be linked to any retaliatory measure.

Therefore, the record reflects that Appellant has failed to demonstrate a causal connection for purposes of her prima facie case of retaliation, and in the alternative, she has further failed to show that the nondiscriminatory grounds the USPS provided for its actions were pretext.

## IV.

Accordingly, the district court's decision granting summary judgment to the USPS on Appellant's Title VII retaliation claim is

*AFFIRMED*.

11